**EXHIBIT A**

Christopher M. Devine                                                                                      04/26/2006

Page 30

1  case?
2  A. They wrote probable cause. And then after
3  they wrote probable cause, the attorney came back
4  and said this needs to be dismissed. So what they
5  did is they slapped me a $2,000 check and dismissed
6  it.
7  Q. So you settled with Luciano's?
8  A. Yes, we settled.
9  Q. So the M.C.A.D. had a probable cause
10 finding?
11 A. Right.
12 Q. And then the attorney for Luciano's raised
13 the issue of it being too late to file untimely?
14 A. It was untimely, yes.
15 Q. But they agreed to pay you $2,000?
16 A. To pay me $2,000, correct.
17 Q. Did you sign a Settlement Agreement?
18 A. Yes, I did.
19 Q. And that is why you did not bring any court
20 action against Luciano's Restaurant?
21 A. That's correct.
22 Q. Do you recall when you settled that case?
23 Do you recall when you received the check and signed
24 the agreement?

Page 31

1  A. Let me think. It had to have been in 2004.
2  Q. Mark this as an exhibit, please.
3     (Marked, Exhibit 1, submission to
4  court.)
5  Q. I'm going to show you what's been marked as
6  Exhibit 1. Do you recognize that document? I'm
7  just asking if you recognize it. I'm not going to
8  ask you to read the whole thing. I'm only going to
9  ask you about the first page at this time. Do you
10 recognize that document?
11 A. No, I don't recognize it, but I did write it
12 because that's my handwriting.
13 Q. That's your handwriting?
14 A. Yes.
15 Q. Is that one of the documents you submitted
16 to the Federal Court in this action, the lawsuit
17 against Stop & Shop? And I'm going to ask about
18 that second page in a second. I just want to
19 understand generally if this entire document, do you
20 recall filing this in court?
21 A. I recall filing it, yes.
22 Q. Now, looking at that second page and third
23 page.
24 A. One of the reasons why I did is because I

Page 32

1  just wanted the judge to look at it in a different
2  way in how the M.C.A.D. investigated the case
3  between the Stop & Shop case and the Luciano's case
4  because they came back with lack of probable cause
5  in one case and then came back with probable cause
6  in another.
7  Q. I understand.
8  A. And the difference between their
9  investigations were totally different. So that's
10 the one of the reasons why I gave them this.
11 Q. So just looking at those last two pages.
12 That's the probable cause finding in your --
13 A. That is the --
14 Q. Let me finish. -- in your case against
15 Luciano's Restaurant?
16 A. Correct.
17 Q. And you submitted this to the court in the
18 Stop & Shop case. Is the date on the first page
19 April 2nd, 2005?
20 A. That's what it says, yes.
21 Q. And you were submitting this to show the
22 court the difference in how the M.C.A.D.
23 investigator --
24 A. Correct. Yes.

Page 33

1  Q. Now, other than your lawsuit against
2  Luciano's Restaurant and other than this action, I
3  should say this action and the state court action
4  against Stop & Shop, have you ever filed any other
5  lawsuits or discrimination claims?
6  A. No.
7  Q. You stated that other than speaking at the
8  M.C.A.D. conference you've never testified in any
9  other form. Earlier when I asked if you ever
10 testified before, you said that in the Luciano's
11 case you spoke at one of the M.C.A.D. conferences?
12 A. I think it was under oath.
13 Q. Correct. You never testified under oath?
14 A. Right.
15 Q. Has anyone ever sued you for anything in any
16 lawsuit?
17 A. No.
18 Q. Have you ever been arrested for any crime?
19 A. Misdemeanors.
20 Q. What types of misdemeanors?
21 A. Disorderly conduct.
22 Q. And when was that?
23 A. I would say before they wrote probable cause
24 from the M.C.A.D. What's the date on that

LegaLink Boston, A Merrill Company
(617) 542-0039

Page 34

1  investigation?
2  Q. You're referring to the M.C.A.D.'s probable
3  cause finding?
4  A. Yeah.
5  Q. Referring to Exhibit 1 -- it's not dated.
6  In any event, why are you connecting it to the
7  probable cause finding?
8  A. Because I went there and screamed and
9  yelled, said that they went over the 18 month period
10 to give me a response from the M.C.A.D.
11 investigation.
12 Q. I see.
13 A. I went there, screamed and yelled was my
14 response.
15 Q. At the M.C.A.D.?
16 A. Right.
17 Q. Were you in the lobby?
18 A. I was in the lobby. I was in the office. I
19 was screaming.
20 Q. So who were you screaming at?
21 A. Well, Aileen Quintero gave me an attitude.
22 Q. Why don't we start from the top. So you
23 went to the M.C.A.D.?
24 A. Yeah.

Page 35

1  Q. It had been more than 18 months in the
2  Luciano's case?
3  A. It was more than 18 months, right. So they
4  went over their time.
5  Q. What happened?
6  A. They just continued to tell me that my
7  investigation is still in process, but yet they went
8  over the 18 months. They said -- they weren't
9  giving me an exact time of when they would write
10 lack of probable cause or probable cause. They
11 weren't giving me any details. So I was asking her
12 what was going on, and she was getting a little
13 upset because I had been in more than once, and she
14 kind of snapped at me. And then after she was out
15 of my presence, I just screamed very out loud for
16 her to give me a response.
17 Q. After she had left?
18 A. Well, she heard me.
19 Q. Were you in the lobby at the time?
20 A. No, I was in the office.
21 Q. In her office?
22 A. No. I was in the area, in the entrance
23 area.
24 Q. The reception area?

Page 36

1  A. The reception area.
2  Q. The M.C.A.D. reception area?
3  A. Yes.
4  Q. You don't recall when this took place?
5  A. It was before they wrote -- a month before
6  they wrote probable cause to that complaint.
7  Q. And you said that you had been there more
8  than once. Approximately how many times had you
9  been there to complain about the time that it was
10 taking?
11 A. Well, when I realized that it was over 18
12 months, I was giving them, you know, frequent
13 visits.
14 Q. How frequent?
15 A. Maybe like twice or three times a month.
16 Q. For how many months?
17 A. I don't recall.
18 Q. More than one a month?
19 A. Possibly.
20 Q. And on each of these occasions would you
21 meet with Ms. Quinitero?
22 A. I met with her boss as well. I was waiting
23 for a deposition, not deposition, a position
24 statement from the respondent. They told me, oh,

Page 37

1  we're going to get a position statement. So I was
2  waiting on the position statement and it took a
3  while for this position statement to come back and I
4  was asking them what was going on, and they told me
5  to be patient, and I was trying to be patient as
6  best as I could and I kind of blew up.
7  Q. You blew up on the first occasion when you
8  went in to hear this or on each occasion?
9  A. I only blew up on one occasion.
10 Q. You only blew up on one occasion. That was
11 the one you were describing earlier?
12 A. Right.
13 Q. And did the M.C.A.D. or somebody from the
14 M.C.A.D. call the police?
15 A. What happened was, is that I flipped out in
16 the hallway. I was still upset and angry, and I was
17 leaving -- they wanted to, you know, bring me back
18 into the M.C.A.D. to, you know, calm me down and
19 explain to me, you know, what was supposed to
20 happen. I refused. And what happened was is that I
21 left the -- I tried leaving the building and the
22 police came after me and they were giving me a
23 difficult time in the entranceway to the building.
24 Q. Were you inside the lobby of the building or

Page 38

1  outside on the sidewalk?
2     A. I was downstairs.
3     Q. In the main lobby of the building?
4     A. In the main lobby of the building.
5     Q. One Ashburton Place?
6     A. Right. And they wanted to bring me back up
7  to the M.C.A.D. along with the police.
8     Q. So the police approached you in the building
9  lobby?
10    A. Yes.
11    Q. And they wanted to bring you back upstairs
12 to the M.C.A.D.?
13    A. Right. I said no, I'm refusing. They
14 wouldn't let me leave the building. They were
15 giving me a difficult time.
16    Q. And then what happened?
17    A. Then I ended up -- well, they ended up
18 getting into my face, and I got into their face
19 back, and what happened was is that they decided
20 they were going to arrest me for disorderly conduct.
21    Q. Is this the state police?
22    A. The state police, correct.
23    Q. When you say you were getting into their
24 face, did you physically touch them?

Page 39

1     A. No, I didn't physically touch them. They
2  physically touched me. They held me down. They
3  threw me down on the ground and handcuffed me.
4     Q. They threw you down on the ground?
5     A. Yeah.
6     Q. Prior to them arresting you for disorderly
7  conduct, you said they were in your face and you
8  were in their face. How many policemen were there?
9     A. There were two of them.
10    Q. When you say you were in their face, were
11 you --
12    A. Well, they were in my face. They were like
13 very close to me, and they were just trying to
14 explain to me, oh, come back up to the M.C.A.D. So
15 they were continuously pushing buttons to the point
16 that I had to blow up in front of their face. So I
17 did.
18    Q. In what way? What did you do?
19    A. I was just screaming. I was just yelling at
20 them, you know, just leave me alone because they
21 were -- they just wanted to -- they didn't want
22 themselves to look like idiots so that's what they
23 had to do.
24    Q. So you were yelling at the policemen?

Page 40

1     A. Yes.
2     Q. You said they pushed your buttons sort to
3  speak?
4     A. They pushed me to the fact that I got back
5  into their face.
6     Q. They pushed your buttons to the fact that
7  you then yelled back at them?
8     A. I yelled back at them, yes.
9     Q. Would you describe yourself as having a
10 short temper?
11    A. No.
12    Q. No?
13    A. No.
14    Q. So you were arrested for disorderly conduct?
15    A. Right.
16    Q. What happened with those charges?
17    A. They were dropped.
18    Q. At what point?
19    A. I would say a month later before probable
20 cause was --
21    Q. Did you have to appear in court?
22    A. Yes.
23    Q. Was it before a clerk or a judge?
24    A. It was before a judge.

Page 41

1     Q. Did you say before the --
2     A. Well, what happened was, is that I went to
3  court. So the first time, the judge that brought me
4  to court the first time wanted to admit me into a
5  mental facility. So they did.
6     Q. When was this?
7     A. This was a month before the M.C.A.D.
8  investigation.
9     Q. Before the findings?
10    A. Before the findings, yes. They just felt
11 that I had an anger problem and I needed to be in a
12 facility.
13    Q. Let me just stop you for a second and we'll
14 get back to it. Just try to estimate the time. And
15 we don't know the time of the decision. You said it
16 was after 18 months after you filed your claim?
17    A. Yes.
18    Q. And you filed your claim in March of '03?
19    A. Right.
20    Q. So a year-and-a-half after that would be at
21 least late '04 somewhere in 2005?
22    A. Yes. Right.
23    Q. Do you remember if it was the winter, the
24 spring, the summer?

Page 42

1   A. It was the winter.
2   Q. So maybe end of '04 early '05?
3   A. Actually it was a year ago. It could have
4   been a year ago.
5   Q. So early 2005?
6   A. Yeah.
7   Q. In what court was this first court
8   appearance in?
9   A. John McCormack.
10  Q. John McCormack building in Boston?
11  A. In Boston, yes.
12  Q. And do you recall the name of the judge?
13  A. He was Italian. All I know is he was an
14  Italian judge.
15  Q. Do you understand the reasons why he decided
16  to admit you into a mental facility?
17  A. Well, I had a conversation with him. He
18  wanted to find out if I was incapable of having a
19  conversation with him. So what he did was, he was
20  trying to figure me out. And I was very responsive
21  to his questions and what he was asking me, asking
22  me, you know, I think you need to go into a mental
23  facility. I think you need help. So I was refusing
24  this. I said no, I don't need help.

Page 43

1       What happened was, was that he wasn't
2   informing anybody that he was having this
3   conversation with me. So he just said during the
4   court process, you know, just come over here and
5   talk to me. So I did. You know, my lawyer at the
6   time was just, you know, just finding out what the
7   conversation was about.
8   Q. Let me just stop you for a second before we
9   get too far.
10  A. Yeah.
11  Q. This happened in the courtroom?
12  A. Yes.
13  Q. And you got a lawyer?
14  A. Yes.
15  Q. A public defender?
16  A. Yes.
17  Q. Do you remember the name of the lawyer?
18  A. She was a blonde lady.
19  Q. It's okay. So in the courtroom the judge
20  asked to speak to you, just the two of you sort of
21  aside?
22  A. Yes.
23  Q. Was he still up on the bench? Where was the
24  conversation?

Page 44

1   A. I was in his --
2   Q. Chambers?
3   A. Not chambers but, you know, the stand.
4   Q. Side bar?
5   A. Side bar, yes.
6   Q. And your attorney was not present during the
7   conversation?
8   A. The attorney was not present.
9   Q. She was in the courtroom but not with you?
10  A. She was in the courtroom, right. When the
11  judge came back after the conversation and said that
12  he was going to admit me into a facility, the
13  attorney was saying, you know, your Honor, I don't
14  think this man needs to be placed in a facility and
15  tried to explain to him, you know, that I was
16  capable of getting this case dismissed.
17  Q. How long did the conversation between you
18  and the judge take?
19  A. It was a good maybe eight minutes.
20  Q. And do you recall what things he asked you
21  or what things he said that led to him concluding
22  that he wanted to admit you into a mental facility?
23  A. I don't recall. I don't remember his exact
24  words of what he said.

Page 45

1   Q. Generally what he was asking you.
2   A. Just that I needed to be -- I just needed to
3   be -- because apparently if I had -- well, the
4   disorderly conduct was twice. It wasn't just once.
5   Q. What was the other one?
6   A. I had a difficult -- there was disorderly
7   conduct from -- I was arrested in Mansfield.
8   Q. When was that?
9   A. A year before.
10  Q. We're going to get to that in a second.
11  Let's just finish up on this conversation with the
12  judge.
13      In your conversation with the judge, did
14  you lose your temper at all? Did you --
15  A. No. I was very calm.
16  Q. And after the conversation with the judge
17  then in the court in front of your attorney, the
18  judge said he would like to admit you into a mental
19  facility?
20  A. Correct.
21  Q. Your attorney said she didn't think that was
22  necessary?
23  A. Correct.
24  Q. What happened next?

Page 46

1  A. All I know is that I was handcuffed and I
2  was placed into a cell until I made up my mind of
3  what facility I wanted to go to.
4  Q. So the judge ordered that you go into a
5  facility but left it up to you which facility?
6  A. Right. So they threw me in Lindemann
7  Hospital.
8  Q. Where is that located?
9  A. It's in Boston.
10 Q. And how long were you at Lindemann Hospital?
11 A. I would say maybe a couple of weeks.
12 Q. Before we get to that. After the arrest by
13 the state police of the M.C.A.D., were you bailed
14 out or were you in jail until this court hearing?
15 A. Well, I was placed in the facility. I was
16 transported from the mental facility to the
17 courthouse.
18 Q. So you initially were put into a mental
19 facility right after the arrest?
20 A. Correct.
21 Q. Before this conversation with the judge?
22 A. Correct.
23 Q. So --
24 A. Before? No, after the conversation.

Page 47

1  Q. I'm backing up. I don't want to confuse
2  you.
3  A. Okay.
4  Q. I'm just getting the sequence from the
5  arrest from the disorderly conduct at the M.C.A.D.
6  A. Yeah.
7  Q. Were you put into jail or were you released
8  before the court hearing?
9  A. I was put into jail.
10 Q. For how long?
11 A. I don't recall if I was released or if I was
12 placed in the hospital. It was kind -- it's kind of
13 confusing. I can't recall to actually say if I was
14 released before I was -- no. I was released. I was
15 released and then I went back to court and that's
16 when the court --
17 Q. Before being released, did you spend any
18 days or nights in jail or the hospital before you
19 were released?
20 A. Well, they had nowhere else to put me so
21 they placed me in the jail cell for a night.
22 Q. Just one night?
23 A. One night.
24 Q. Then you were released?

Page 48

1  A. Then I was released.
2  Q. Then you appeared for court, and then the
3  judge ordered you into a mental facility?
4  A. Right.
5  Q. And you went to Lindemann for a couple of
6  weeks?
7  A. Correct.
8  Q. Do you know what you were treated for at
9  Lindemann?
10 A. It was -- they diagnosed me with some sort
11 of personality disorder. So I guess that -- I mean,
12 I've been -- I actually accepted the fact that the
13 man put me in a hospital because I had been in a
14 hospital before.
15 Q. So this was not the first time?
16 A. This is not the first time, correct.
17 Q. Before we get to that, you've got a bunch of
18 tangents to go down. We haven't even gotten started
19 yet. Let me close the loop on the Lindemann
20 Hospital piece.
21 A. Okay.
22 Q. So you believe on that occasion you were
23 diagnosed with a personality disorder?
24 A. Yeah, but I was previously diagnosed with

Page 49

1  bipolar disorder.
2  Q. Bipolar disorder?
3  A. Yeah.
4  Q. When were you diagnosed with bipolar
5  disorder?
6  A. I would say when I was fired from Luciano's
7  Restaurant.
8  Q. Somewhere around May of 2002?
9  A. Yeah.
10 Q. While you were at Lindemann, what type of
11 treatment did you receive?
12 A. I was placed on -- well, I refused to take
13 some form of medication they were giving me. So I
14 refused. But then after a while they told me that
15 it was just one milligram of something. So I agreed
16 to it. So they put me on something. Then after I
17 got out of there I saw a therapist or a
18 psychiatrist, psychiatrist and I asked to -- they
19 put me on Risperdal and it didn't -- it affected me
20 real differently. So I couldn't stay on the one
21 milligram. So we agreed to increase it. I didn't
22 mind increasing it, but I had difficulty. So they
23 put me on the medicine that I originally was on in
24 2002 when I was admitted to the hospital.

Page 50

1   Q. Which medicine was that?
2   A. That was called Zyprexa. Z Y P R E X A.
3   Q. So other than being put on this medication
4   by Lindemann Hospital, did you receive any other
5   treatment there? Did you receive counseling? Did
6   you receive any other treatment?
7   A. After --
8   Q. While you were at Lindemann.
9   A. Yeah. They had counselors. They had, you
10  know, those types of people.
11  Q. After approximately two weeks they released
12  you?
13  A. Correct.
14  Q. What happened next with respect to the
15  criminal charges for the disorderly conduct on that
16  occasion?
17  A. I was -- well, they released me from the
18  Lindemann. So the court from before was all set
19  because they were evaluating my mental disability
20  from the disorderly conduct while I was in the
21  hospital. So they were evaluating me.
22  Q. What was their conclusion?
23  A. I don't recall. They never told me.
24  Q. What happened with the criminal charges?

Page 51

1   A. They released me, from the disorderly
2   conduct they released me.
3   Q. You say they released you.
4   A. Well --
5   Q. Were the charges dropped as a result of you
6   going to Lindemann?
7   A. No. I was supposed to appear in court for
8   the charges to be dropped for disorderly conduct
9   while I was in the hospital.
10  Q. And what happened?
11  A. And they did a continuance without a
12  finding.
13  Q. And did you show up at any later point?
14  A. Yes, I did.
15  Q. And what happened at that point?
16  A. That's when they insisted that -- well, the
17  lawyer brought that forward, and the judge believed
18  me from whatever I had agreed to, he dropped the
19  disorderly conduct.
20  Q. So it was dismissed?
21  A. It was dismissed, yes.
22  Q. Other than these two arrests for disorderly
23  conduct, were you arrested for any other crime?
24  A. No.

Page 52

1   Q. Have you ever been convicted of any crimes?
2   A. Criminally?
3   Q. Yes.
4   A. No.
5   Q. Let's talk about the first disorderly
6   conduct. That happened approximately a year earlier
7   you said?
8   A. A year before, yeah.
9   Q. So maybe early 2004 approximately?
10  A. Yeah.
11  Q. What happened on that occasion?
12  A. I don't know. My car broke down. So I
13  ended up -- the police was -- I was at an
14  intersection and my car broke down. I was giving
15  the cop a hard time. I was so upset that my car
16  broke down. The cop wanted to help me but I was
17  giving him a hard time. So what happened was, he
18  could only take so much of me. So he arrested me.
19  Q. What town did this take place in?
20  A. It was in Mansfield.
21  Q. So the cop was there to help you and you
22  were giving him a hard time because you were --
23  A. Well, I was so upset. I don't think he knew
24  how to evaluate my behavior. So he had a difficult

Page 53

1   time evaluating, you know, trying to get me to calm
2   down. Rather than giving me a hard time about it,
3   he didn't, he wasn't evaluating my behavior because
4   I was so upset.
5   Q. And were you released or did you spend any
6   time in jail immediately after the arrest?
7   A. I was bailed.
8   Q. And did you have to appear in court?
9   A. Yes.
10  Q. What happened?
11  A. It got dismissed.
12  Q. Did the police drop the charges or did the
13  judge just dismiss it?
14  A. The judge dismissed it.
15  Q. So other than those two disorderly conduct
16  charges, you were not arrested for any other crime?
17  A. Right.
18  Q. Let's just go back and take care of some
19  preliminary things and then we'll get back to some
20  of those things.
21      Did you review any documents in
22  preparation for today?
23  A. No.
24  Q. Did you discuss today's deposition with