UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER M. DEVINE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>STOP AND SHOP COMPANIES, )<br>)<br>Defendant. )<br>) | CIVIL ACTION NO. 04-12186-JGD |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to the Court's Order in the above-captioned matter, the Defendant, The Stop and Shop Supermarket Company LLC ("Defendant" or "Stop and Shop"), respectfully submits this Post-Trial Brief, including its proposed findings of fact and recommended rulings of law.

**PROPOSED FINDINGS OF FACT**

1.      The Plaintiff, Christopher Devine ("Plaintiff" or "Devine"), worked for Stop & Shop on a part-time basis in its Mansfield, Massachusetts store from approximately February 6, 2000 until his resignation, effective December 9, 2000. Trial Transcript, Day One ("Tr. I"), at 50; Trial Transcript, Day Two ("Tr. II"), at 13.

2.      Devine first worked as a part-time cashier and, subsequently, as a part-time Bake Shop clerk in the Mansfield store. Tr. I, 26-27, 40-41.

3.      While Devine served as a part-time cashier and bagger, he experienced a number of job performance and behavioral issues, including cash shortages from his cash register drawer,

improper bagging of groceries and disruptive behavior in front of customers.[1]  Tr. I, 27-30, 34-40; Tr. II, 57-59, 84-85.

4.     In or around May 2000, because Devine was struggling to perform adequately as a cashier, Stop & Shop transferred Devine to the Bake Shop as a part-time pan-out clerk, continuing to work a five-hour shift about four to five nights per week.  Tr. I, 40-41; Tr. II, 15, 33-34, 56.

5.     Devine's essential job duties in the Bake Shop were to complete the pan-out and clean the Bake Shop at the end of his shift.  Tr. I, 40-41.  In performing and completing the pan-out, Devine was responsible for removing different types of frozen dough from boxes in the freezer, prepping them and placing them on racks to defrost so that the Baker could bake them the following morning.  Tr. I, 40, 104-105.

6.     In June 2000, Devine was out of work for approximately one month for a strep infection.  Tr. I, 160, 178; Tr. II, 15.

7.     At some point during the Summer of 2000, Fatima Cabral, the Bake Shop's lead clerk, learned from two of Devine's co-workers, Al Bruno and Armando Avila, that Devine had suspected that he was HIV-positive.  Tr. I, 96, 159-160; Tr. II, 16.

8.     After Devine learned that Cabral was aware of his suspected condition, Devine discussed it with Cabral, and she encouraged Devine to see a doctor.  Tr. I, 161; Tr. II, 16, 38-39.

9.     Devine followed Cabral's suggestion and consulted with a doctor, who diagnosed him as being HIV-positive.  Tr. II, 16-17, 39.

10.    On a Sunday afternoon in July or August of 2000, shortly after returning home from work, Cabral received a telephone call at home from Svetlana, a clerk in the Bake Shop,

---

[1] While Devine now claims to have suffered from a learning disability at the time, many of his performance and conduct issues as a cashier were wholly unrelated to any effects of a learning disability.  Tr. II, 57-59, 84-85.

who was very upset. Tr. I, 161-162; Tr. II, 16. Svetlana informed Cabral that Devine, while not scheduled to work, had run into the Bake Shop, appearing disheveled and barefooted. Tr. I, 161-163. Cabral grabbed a pair of her son's socks, left her family and drove approximately thirty-five minutes back to the store to come to Devine's aid. *Id.* Cabral found Devine in the Bake Shop and asked him what had happened. Tr. I, 163. He stated that he had a fight with his father and ran out of the house. *Id.* Cabral offered to drive Devine to his home to pick up a pair of shoes, but Devine said that he could not go home. Tr. I, 163-164. Cabral then drove Devine to the mall, bought him shoes with her own money and bought him dinner because he had not eaten. Tr. I, 164-165. Cabral brought Devine back to the store and tried, to no avail, to find him a shelter in which to spend the night. *Id.* She also offered to drop him off at a friend's house, if possible. *Id.*

11. During the dinner conversation that Sunday, Devine told Cabral that he had been tested and that he was officially diagnosed as HIV-positive. Tr. I, 95, 164, 165-166.

12. Cabral encouraged Devine to seek counseling and assistance in dealing with this condition. Tr. I, 166-167. She also encouraged him to discuss his condition with his family. Tr. I, 167; Tr. II, 39. Cabral even suggested that Devine inform any prior sexual partners of his diagnosis for their safety. Tr. II, 40.

13. Devine told Cabral that he did not want her to share this information with store management. Tr. I, 167; Tr. II, 39.

14. As the Bake Shop's lead clerk, Cabral was not a member of management. Tr. I, 23-24, 64, 79, 152-154; Exhibit 8. She was a member of Devine's union, and she did not have the authority to hire or fire employees, impose discipline or affect wages. *Id.*; Tr. I, 42, 154-156.

15. Devine had significant performance issues in the Bake Shop, regularly failing to

complete his pan-out tasks, completing about two hours worth of work during his four to five hour shift, and he often failed to clean the department adequately. Tr. I, 127, 130-131, 134; Tr. II, 17.

16.     Cabral and Devine's co-workers did their best to cover for Devine by completing his work assignments for him, often by co-workers Armando Avila or Al Bruno performing some of Devine's pan-out duties during their day shifts, and often by the Baker, Michelle Zainyeh, having to complete the pan-out in the morning after Devine failed to complete it the previous night. Tr. I, 99-100, 101, 119, 121-125, 129-130, 174, 180; Tr. II, 50-51. On many of these occasions, Devine and Cabral were not even aware that Devine's co-workers had completed his work for him. Tr. I, 119, 121, 123-125, 129-130, 180. Even when his co-workers helped Devine by performing some of his duties, he still failed to perform his few remaining duties. Tr. I, 135.

17.     Armando Avila transferred from the Mansfield store to another store on September 25, 2000. Tr. II, 85-88; Exhibit 11.

18.     After Avila left the store, Al Bruno would complain to Cabral about always having to perform Devine's job for him. Tr. I, 174-175. Nevertheless, Bruno would continue to perform Devine's duties. *Id.*

19.     Bruno transferred from the Mansfield store to another store on October 29, 2000. Tr. II, 88; Exhibit 12.

20.     After Avila and Bruno left the store, Devine's performance deficiencies became more evident to Cabral because these co-workers were no longer performing his job for him. Tr. I, 100, 111-113, 121-123, 129-130, 174, 180.

21.     Cabral filled in for the Baker, Michelle Zainyeh, while Zainyeh was out on

medical leave from October 9, 2000 through at least November 10, 2000. Tr. I, 54-55, 100, 111-112. Only when Cabral assumed Zainyeh's responsibilities did Cabral realize the extent of Devine's performance failures, as she regularly arrived at 5:00 a.m. to find the department to be a disaster after Devine failed to complete his pan-out or clean the Bake Shop the prior night. Tr. I, 100, 111-113, 118, 171, 180. Cabral would have to perform Devine's job as a result, completing the pan-out herself, having to defrost and prep the dough in order to bake the breads, rolls, doughnuts and other bakery items. Tr. I, 81, 100, 111-113, 118, 171, 172-173. This would delay her ability to bake the breads and other items on time and made her job extremely difficult. Tr. I, 81, 111-113, 118, 171.

22. Cabral realized that Zainyeh had been facing the same disaster each morning and had been performing Devine's pan-out job for him, which exacerbated Zainyeh's own illness, Lupus, leading her to take a medical leave of absence. Tr. I, 121-122, 150, 172-173, 180.

23. Rather than having to perform the pan-out herself at 5:00 a.m., Cabral started having Devine's co-workers perform the pan-out during the day, leaving minimal duties left for Devine at night. Tr. I, 136, 145-146, 171-173. Yet, Devine still failed to perform the limited duties left for him, such as cleaning the Bake Shop floor and tables. Tr. I, 146.

24. Cabral asked Devine to inform the Store Manager, Bob Slarve, or the Perishable Manager, Diana Paris, of his condition because he was having problems performing his tasks. Tr. I, 95; Tr. II, 20, 45.

25. Devine refused to inform Slarve or Paris of his condition at that time because he wanted to keep it confidential, and Devine instructed Cabral to keep his condition confidential. Tr. I, 95, 149, 166, 167-168; Tr. II, 20, 22, 45-46. Devine further asked Cabral not to share his performance issues with Slarve or management. Tr. II, 46, 68.

5

26. Cabral did not report Devine's performance issues to management, including Slarve or Paris, because without Cabral being able to inform them of a reason for his performance issues, such as his medical condition, she believed they would have written him up and proceeded through the normal performance management steps, possibly leading to his termination. Tr. I, 98-100, 102, 107-108, 109-111, 113-115, 124, 126-127, 143-145, 151, 168-169. Cabral did not want Devine to lose his job, as she knew that he needed the job and the money. Tr. I, 102, 113, 115, 143. Because Devine refused to inform management of his HIV-positive status, Cabral felt that her "hands [were] tied" in that she could not help Devine with his performance issues and save his job if he refused to disclose his medical condition to management or provide a doctor's note. Tr. I, 98-100, 102, 109-111, 113-115, 124, 126-127, 143-145, 151, 168-169; Tr. II, 46-49.

27. Likewise, Cabral could not ask management to hire another person to help complete Devine's duties because she had sufficient staffing and would need a reason for this need. Tr. I, 113-114.

28. Cabral discussed Devine's performance issues with him, and she encouraged him to inform management of his medical condition and provide a doctor's note. Tr. I, 98, 114-115, 130, 143-144, 148, 167-169. However, Devine persistently refused to inform management of his HIV-positive status or to allow Cabral to convey it to management. *Id.*

29. Accordingly, due to the efforts of Cabral and Devine's other co-workers, management never learned of Devine's performance issues. Tr. I, 14, 17, 79, 82-83, 98-100, 102, 107-108, 109-111, 113-115, 121-124, 167-169.

30. Devine never asked Cabral for any accommodation, nor did he ever inform her that he needed assistance. Tr. I, 175. He also never provided her any doctor's note related to his

6

HIV-positive condition. *Id.*

33. Cabral never informed Slarve or Paris that Devine was HIV-positive. Tr. I, 108, 168-169.

32. While Paris learned of Devine's HIV status at some point in time, she had no knowledge that it affected his job performance in any way or his ability to finish tasks. Tr. I, 68, 82-83.

33. On November 8, 2000, Paris wrote up Devine (on a Form 191)[2] for misinforming her that he had finished the pan-out when he, in fact, had not completed the pan-out. Tr. I, 69-73, 80-81, 92; *see* Exhibit 6. Paris did *not* write up Devine for simply failing to finish the pan-out. *Id.*; Tr. II, 55.

34. Other than this one incident concerning Devine's failure to notify management that he had not finished the pan-out, Paris was unaware of any performance issues with Devine in the Bake Shop. Tr. I, 79, 82-83.

35. On November 9, 2000, Slarve issued Devine a written counseling (Form 191) for tardiness after Devine was tardy eighteen out of twenty-three occasions over a period of four weeks. Tr. I, 20, 44-46; Exhibit 4. It was not unusual for Slarve to learn of an employee's attendance or tardiness issue from his regular review of the store's time reports or for him to prepare a write-up based on this information, even when the employee's direct manager had not complained to Slarve about the issue beforehand. Tr. II, 88-89.

36. On November 14, 2000, consistent with routine practice, Paris wrote Devine up for failing to call when he was forty-five minutes late for work. Tr. I, 83-85; Exhibit 7.

37. Devine complained to his union about at least one of these counselings, and a

---

[2] A Form 191 is the standard form used by the Company to document any personnel action, including performance counselings, attendance issues, disciplinary measures and changes in job status. Tr. I, 28, 71-73; Tr. II, 87.

7

meeting was held between Devine, his union steward, Slarve and Paris. Tr. I, 20, 86; Tr. II, 59. During this meeting, Devine informed them that he was late for work on these occasions because he was late coming from school. Tr. I, 21; Tr. II, 62. Devine did not attribute his tardiness to any medical condition. Tr. I, 21; Tr. II, 62.

38.     Shortly after the union meeting, Devine informed the Company that he was resigning, and he gave two weeks notice. Tr. I, 48, 176; Tr. II, 62. At some point during this two-week period, Devine did not appear for his scheduled shift without calling the store. Tr. I, 48, 176; Tr. II, 62. Stop & Shop never heard from Devine again. Tr. I, 48, 176; Tr. II, 62.

39.     Devine's last day of employment with Stop & Shop was December 9, 2000. Tr. I, 50.

40.     Devine voluntarily resigned from Stop & Shop because he wanted to concentrate on school full-time. Tr. II, 64-65.

41.     Prior to resigning, Devine never notified his union representatives of his condition or purported need for accommodation, nor did he ever ask the union for assistance in obtaining an accommodation. Tr. II, 63-64.

42.     While Slarve heard rumors of Devine's HIV-positive status at some point in time, Devine never brought it to Slarve's attention. Tr. I, 14, 21, 43. Neither Cabral nor Paris ever discussed Devine's medical condition with Slarve either. Tr. I, 43, 108.

43.     Slarve did not have any knowledge that Devine had any performance issues while working in the Bake Shop, other than tardiness. Tr. I, 17, 21-22, 41, 43, 63, 107-108. Slarve likewise did not have any knowledge that Devine's condition affected his job performance in any manner or his ability to finish tasks. Tr. I, 21-22, 43-44, 63.

44.     Prior to Devine's resignation, neither Paris nor any member of Stop & Shop

8

management knew of any physical effects of Devine's HIV positive status.  Tr. I, 21-22, 43-44, 63, 82-83, 88, 90.

45.     Prior to his resignation, neither Paris nor any member of Stop & Shop management knew that Devine's HIV positive status caused him any difficulty in performing his job.  Tr. I, 21-22, 43-44, 63, 79, 82-83, 88, 90, 107-108.

46.     Devine never requested from management, explicitly or implicitly, any reasonable accommodation.  Tr. I, 44, 83, 88.  Devine never notified any member of Stop & Shop management that he was not finishing his tasks or that he needed any assistance from the Company.  Tr. I, 63, 88.

47.     The only doctor's note Stop & Shop management ever received from Devine was at the time of his June 2000 hospitalization for the strep infection.  Tr. I, 50.

48.     During the same time period, Fall of 2000, Stop & Shop was providing accommodations to other employees within the Mansfield Bake Shop who made management aware of their own impairments and need for reasonable accommodation.  Tr. I, 50-52, 126, 133-134, 175.  For instance, Stop & Shop accommodated Michelle Zainyeh, the full-time Baker, who suffered from Lupus, by not requiring her to work one night per week, as required of other full-time clerks, and by providing her a consistent shift.  Tr. I, 50-54.  The Company further accommodated Zainyeh by providing her leaves of absence when necessary, including one from October 9, 2000 through at least November 10, 2000.  Tr. I, 54-55, 150.

49.     Stop & Shop also accommodated two other clerks within the Bake Shop at the time, one with a leg condition and the other unable to drive at night due to a night vision impairment.  Tr. I, 133-134.

50.     The Company has provided Cabral, herself, an accommodation for her chronic

lung condition (she was born with one lung) by adjusting her duties when necessary. Tr. I, 126.

    51.    Plaintiff did not submit any evidence at trial concerning his income while working for Stop & Shop, nor did he produce any evidence regarding any damages or injury suffered by him, either monetary or emotional, resulting from any actions or inactions of Stop & Shop.

## RECOMMENDED RULINGS OF LAW

For the reasons set forth more fully below, Stop & Shop respectfully requests that the Court enter Judgment for Defendant on Plaintiff's claim for failure to accommodate a disability, purportedly resulting in his constructive discharge, under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, based on one or more of the following recommended rulings of law:

    A.    Plaintiff failed to prove that he was disabled within the meaning of the ADA because he did not introduce any evidence that his HIV-positive status substantially limited him in a major life activity during the time in question.

    B.    Plaintiff failed to prove that he was qualified for the job because the evidence demonstrates that he could not perform the essential functions of his position with or without reasonable accommodation.

    C.    Plaintiff failed to prove that Stop & Shop management had any knowledge of his purported physical limitations and need for accommodation, and thus, Stop & Shop did not fail to engage in the interactive process or fail to provide Plaintiff a reasonable accommodation.

    D.    Plaintiff failed to prove that Stop & Shop's alleged failure to accommodate affected the terms, conditions or privileges of his employment because the evidence did not support a finding that Stop & Shop constructively discharged Plaintiff, as he failed to prove an intolerable work environment from which a reasonable person in his shoes would have felt compelled to resign.

The Court should not find any liability against Stop & Shop. However, in the event that the Court finds for Plaintiff, it cannot award him any damages because he failed to produce any evidence whatsoever of actual injury and causation, as required to support a damages award.

**ARGUMENT**

I. **PLAINTIFF FAILED TO ESTABLISH THE REQUISITE ELEMENTS OF HIS FAILURE TO ACCOMMODATE CLAIM UNDER THE ADA.**

The Court should find for Defendant on Plaintiff's claim because Devine is unable to satisfy one or more of the requisite elements of his failure to accommodate claim. In order to succeed on his failure to accommodate claim under the ADA, Devine must present sufficient, admissible evidence that: (1) he was a qualified individual with a disability within the meaning of the ADA; (2) Stop and Shop was covered by the ADA; (3) Stop and Shop had knowledge of Devine's disability and physical limitations; (4) Stop and Shop failed to accommodate Devine's limitations; and (5) the failure to accommodate affected the terms, conditions or privileges of Devine's employment. *See Orta-Castro v. Merck, Sharp, Dohme Quimica P.R.*, 447 F.3d 105, 112 (1st Cir. 2006); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F. 3d 252, 264 (1st Cir. 1999). Because Devine failed to establish at least four requisite elements of his claim, the Court should enter judgment in favor of Stop and Shop.

    A. **Plaintiff Failed To Prove That He Was Disabled Because He Did Not Introduce Any Evidence That His HIV-Positive Status Substantially Limited A Major Life Activity.**

Devine failed to establish that he was disabled within the meaning of the ADA during the relevant period. To prevail on his claim, Devine must present evidence to demonstrate that, at the time, his HIV infection was an impairment that "substantially limit[ed] a major life activity." *See Bragdon v. Abbott*, 524 U.S. 624, 641-42 (1998). Courts make the determination of whether HIV-positive status substantially limits a major life activity on a case-by-case basis. *See id.* at 642 (declining to address whether HIV infection is a *per se* disability under the ADA); *see also E.E.O.C. v. Lee's Log Cabin, Inc.*, 436 F. Supp.2d 992, 996 (W.D. Wis. 2006) (requiring evidence of the impact of HIV infection on the plaintiff's major life activities); *Cruz Carrillo v.*

11

*AMR Eagle, Inc.*, 148 F. Supp.2d 142, 145 (D.P.R. 2001) (holding that plaintiff with HIV infection bears the burden to prove that HIV substantially limits a major life function). Although some Courts have found HIV-positive status to constitute a disability where the condition substantially limited the plaintiff's ability to reproduce, the Courts have consistently required plaintiffs to introduce evidence demonstrating that their HIV status, in fact, substantially limited their reproductive abilities. *See Cruz Carrillo*, 148 F. Supp.2d at 145; *Bragdon*, 524 U.S. at 640-41; *Lee's Log Cabin*, 436 F. Supp.2d at 996.

Thus, to establish that he was disabled, Devine bore the burden of producing evidence proving that his HIV-positive status substantially limited his reproductive abilities, or some other major life activity, during the relevant period. *Id.* Devine failed to present any such evidence. Accordingly, he failed to establish that he was disabled under the ADA, and the Court should enter judgment in favor of Stop and Shop.

> **B.      Devine Failed To Prove That He Was Qualified For The Job At The Time Because He Admittedly Could Not Complete A Pan Out Or Clean The Bake Shop With Or Without Accommodation.**

Plaintiff also failed to introduce sufficient evidence to prove that he was qualified for his job at the time of his resignation. That is, he failed to prove that he could perform the essential functions of the job with or without reasonable accommodation.

Devine admits that he simply could not perform or complete the two most essential functions of his position – performing a pan out each night and cleaning the Bake Shop at the end of his shift. Tr. I, 100, 111-113, 121-123, 127, 129-131, 134, 146, 174, 180; Tr. II, 17, 20, 22, 30. Indeed, even when Cabral, Alan Bruno, Armando Avila and others voluntarily helped Devine by performing some of his tasks, he still failed miserably at performing his job. *Id.* Further, even when Devine stayed later, he still could not finish his tasks. Tr. II, 116; Exhibit 6.

Accordingly, even with these informal accommodations, Devine could not perform the essential functions of his job.

While Devine contends that Stop & Shop should have accommodated him by reducing his duties and allocating other personnel to perform part of his basic duties, the ADA does not require an employer to forego an essential function of the position, or hire or transfer others to perform a disabled employee's duties. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006) ("[t]he law does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous."); *Kvorjak v. Maine*, 259 F.3d 48, 57 (1st Cir. 2001) (same); *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 149 (1st Cir. 1997) ("[T]he ADA does not require an employer to hire a full-time helper to assist a disabled employee as a reasonable accommodation.").

Plaintiff simply could not perform the essential functions of his job with or without accommodation. He, therefore, was not qualified for the job at the time, and the Court should find for Defendant on his claim.

### C. Plaintiff Failed To Prove That Stop And Shop Management Had Any Knowledge Of His Purported Physical Limitations And Need For Accommodation.

Devine also failed to establish that Stop and Shop had knowledge of his physical limitations and need for accommodation. Devine never informed Stop and Shop management that his HIV-positive status affected his ability to perform the functions of his position. Tr. I, 21-22, 43-44, 63, 68, 79, 82-83, 88, 90, 107-108. While Devine did inform his co-workers of his HIV-positive status, his co-workers, including lead clerk Fatima Cabral, were not members of management.[3]  Tr. I, 23-24, 64, 79, 152-154.

---

[3] While Plaintiff claims that he provided Cabral a note from his physician, Dr. Ginsburg, Cabral denies receiving such a note. Tr. I, 96-97. Indeed, even if Cabral received this alleged note, Devine had previously instructed Cabral

13

Further, even if Cabral was a member of management (which she was not), Devine continually refused to let her disclose to management his medical condition and performance issues. Tr. I, 95, 98, 114-115, 130, 143-144, 148-149, 166, 167-169; Tr. II, 20, 22, 39, 45-46, 68. Cabral obliged Devine's repeated instruction that she keep his condition and performance issues confidential. *Id.* Devine, therefore, prevented Cabral from commencing the interactive process.

Moreover, Devine's co-workers consistently assisted him in performing his job and covered up the fact that he was not performing his job adequately. Tr. I, 17, 63, 79, 82-83, 99-100, 107-108, 121-124. As a result, even if Stop and Shop management learned of Devine's HIV-positive status, it had no notice that he had ongoing performance issues or that this condition affected his performance in any manner. Specifically, Diana Paris did not know that Devine had any ongoing performance issues. Tr. I, 79, 82-83. Her November 8, 2000 write-up concerned merely one incident of Devine misinforming management about finishing the pan-out that night. Tr. I, 92. Paris did not know that Devine had an ongoing problem finishing his tasks. Tr. I, 79, 82-83. Further, Devine admittedly never requested any form of accommodation from the Company. Tr. I, 44, 63, 83, 88. Thus, Stop and Shop management did not know that Devine needed any accommodation. Accordingly, Devine utterly failed to prove that Stop and Shop had the requisite knowledge of his need for accommodation in order to trigger Stop & Shop's obligation to engage in the interactive process with Devine to assess whether it could reasonably accommodate him.

---

not to share his HIV-positive status with management. Thus, even if she received the note, she could not share it with management. According to Devine, Cabral never even read the note. Tr. II, 45. Moreover, at best, Dr. Ginsburg merely stated in the note that Devine had HIV and that it was safe for him to continue to work at Stop & Shop, and vaguely asked "that he be given every consideration." Tr. II, 19. Even as alleged, nothing stated in this note notified Stop & Shop that Devine was limited in any manner or *needed an accommodation* or changes to his job in order to perform the job, nor did Dr. Ginsburg recommend an accommodation. Tr. II, 19, 44-45.

### D. **Plaintiff Failed to Prove That Stop and Shop's Alleged Failure to Accommodate Affected The Terms, Conditions Or Privileges Of His Employment Because Stop & Shop Did Not Constructively Discharge Devine.**

Devine purports to meet the fifth element of his *prima facie* burden by claiming that the alleged failure to accommodate resulted in his constructive discharge. In order to establish a constructive discharge, Devine must prove that his "working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." *See Feliciano-Hill v. Principi*, 439 F.3d 18, 27 (1st Cir. 2006). This is an objective standard; the Court may not consider Devine's subjective beliefs in deciding whether the standard is met. *See id.* Rather, Devine must demonstrate that Stop and Shop imposed "onerous, abusive, or unpleasant" working conditions upon him. *See Vieques Air Link, Inc. v. U.S. Dept. of Labor*, 437 F.3d 102, 109 (1st Cir. 2006). Devine failed to present any evidence that Stop and Shop imposed such "onerous, abusive or unpleasant" working conditions upon him that a reasonable person in his shoes would have felt compelled to resign. Rather, Devine admittedly resigned to focus on his school full-time. Tr. II, 64-65. Accordingly, Devine failed to establish that Stop and Shop constructively discharged him.

Plaintiff, therefore, failed to establish the fifth element of his prima facie case, and his claim fails.

## II. **PLAINTIFF FAILED TO INTRODUCE ANY EVIDENCE OF INJURY TO SUPPORT ANY DAMAGES AWARD.**

Even if the Court found Stop & Shop liable to Plaintiff for failing to accommodate him, he has failed to meet his burden of proof in establishing any resulting damages. That is, Devine did not produce a scintilla of evidence to prove that he suffered any actual injury, as required to support a damages award. *See Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 14, n.13 (1st Cir. 1999) ("Plaintiffs…must prove actual injury…to recover compensatory damages."); *Hogan v. Bangor*

15

*and Aroostock R. Co.*, 61 F.3d 1034, 1037-38 (1st Cir. 1995) (holding that plaintiff must produce adequate evidence of injury, including emotional address, to support any damages award).

With respect to back pay damages, Devine did not submit any evidence to quantify his wages at Stop & Shop and, thus, the amount of any back pay owed to him. Moreover, he did not introduce any evidence of reasonable efforts by him to find subsequent employment. *See Quint*, 172 F.3d at 15 (holding that a plaintiff's entitlement to back pay is contingent upon his actions in using "reasonable diligence" to secure other employment). Devine also did not introduce any evidence that he suffered emotional distress proximately caused by the alleged failure to accommodate, nor did he introduce any evidence of any treatment received for emotional distress caused by Stop & Shop. Plaintiff has the burden of proving both actual injury and causation. *See Hogan*, 61 F.3d at 1037-38. Without such evidence, the Court cannot award Plaintiff any damages, even if it found Stop & Shop liable. *See id.*

## CONCLUSION

For the foregoing reasons, the Court should enter judgment for the Defendant, Stop and Shop, on Plaintiff's claim.

                                                Respectfully submitted,

                                                DEFENDANT
                                                THE STOP AND SHOP SUPERMARKET
                                                COMPANY LLC
                                                By its Attorneys,

                                                /s/_____
                                                Daniel B. Klein
                                                Catherine V. Meek
                                                Seyfarth Shaw LLP
                                                Two Seaport Lane Suite 300
                                                Boston, MA 02210-2028
                                                Telephone: (617) 946-4800
DATED: June 8, 2007                      Telecopier: (617) 946-4801

**CERTIFICATE OF SERVICE**

  I, Daniel B. Klein, hereby certify that on this 8th day of June, 2007, a true copy of the foregoing document was served by regular U.S. Mail, postage prepaid, to the Plaintiff, Christopher M. Devine, 6 Morgan Road, Mansfield, MA 02048.

              /s/_____
              Daniel B. Klein