UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER DEVINE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 04-12186-JGD |
| | ) | |
| STOP AND SHOP COMPANIES, | ) | |
| | ) | |
| Defendant. | ) | |

# FINDINGS OF FACT AND RULINGS OF LAW

October 12, 2007

DEIN, U.S.M.J.

The plaintiff, Christopher Devine ("Mr. Devine" or the "plaintiff"), brought this action against his former employer, The Stop and Shop Supermarket Company LLC ("Stop & Shop" or the "defendant"), alleging that the defendant wrongfully failed to accommodate his disability, which led to his constructive discharge, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. A jury-waived trial was held before this court on April 9 and 13, 2007. The plaintiff proceeded pro se. After consideration of the evidence introduced at trial, and the parties' post-trial submissions, the court makes the following findings of fact and rulings of law in accordance with Fed. R. Civ. P. 52. As detailed herein, judgment shall be entered in favor of the DEFENDANT.

## I. <u>FINDINGS OF FACT</u>

1. Mr. Devine was hired to work part-time at the Mansfield, Massachusetts Stop & Shop in February 2000. (II:13-14). While originally assigned to work as a cashier, he was unable to perform those duties due, he contends, to a learning disability. (II:14). That disability is not relevant to the claims in the instant case.

2. In May 2000, Mr. Devine was transferred to the Bake Shop. (II:14-15). He was hired to work as a part-time "pan-out" clerk for five hours, four to five nights per week. (I:40-41). As a pan-out clerk, Mr. Devine was responsible for preparing the bakery for work the next morning. Thus, he was responsible for removing different types of dough from boxes in the freezer, prepping it, and putting it on racks to defrost for the morning baking. In addition, Mr. Devine was to clean the Bake Shop at the end of his shift so that baking could begin promptly in the morning. (I:40-41; 104-105).

3. In June 2000, Mr. Devine was out of work for approximately one month. (II:15, 34-35). Mr. Devine submitted a doctor's note stating that he had a strep infection, and he was granted one month of unpaid leave. (II:34-36).

4. In the summer of 2000, Mr. Devine had several co-workers, including Alan Bruno ("Mr. Bruno") and Armando Avila ("Mr. Avila"). The lead clerk in the Bake Shop was Fatima Cabral ("Ms. Cabral"). She basically ran the department, and could raise performance issues with the other employees. (I:42). However, she was an employee (not management) and a member of the union. (I:23-24, 64, 79, 152-54; Ex. 8). Ms. Cabral had no authority to hire, fire or discipline employees. (<u>Id.</u>; I:42, 164).

5. Ms. Cabral reported to the perishable manager, Diana Paris ("Ms. Paris"). (I:42). Ms. Paris, in turn, reported to the store manager, Robert Slarve ("Mr. Slarve"). (I:16-17, 26).

6. Ms. Cabral, Ms. Paris and Mr. Slarve all testified at trial, and this court found their testimony to be credible.

7. In July or August 2000, Mr. Devine suspected he was HIV positive. (II:15-16). He confided his concerns to his co-workers Messrs. Bruno and Avila. Messrs. Bruno and Avila then advised Ms. Cabral that Mr. Devine

suspected that he was HIV positive. (I:96, 159-60). Mr. Devine consented to this disclosure to Ms. Cabral. (I:159-60).

8. Mr. Devine and Ms. Cabral discussed the situation, and she encouraged him to see a doctor. (I:161, II:16-17, 38-39). Subsequent testing established that he was, in fact, HIV positive. (II:16-17).

9. One Sunday afternoon in July or August 2000, Ms. Cabral received a phone call at home from another clerk in the Bake Shop, who informed her that Mr. Devine had appeared at work disheveled and barefoot, although he was not scheduled to work. (I:161-63; II:16). Ms. Cabral drove back to work to help Mr. Devine. It seems that Mr. Devine had had a fight with his father, and had run out of his house. Ms. Cabral bought Mr. Devine shoes and dinner with her own money, and tried to find him a place to stay. (I:163-66). During this dinner, Mr. Devine told Ms. Cabral that he had been officially diagnosed as HIV positive. (I:95, 164, 165-66).

10. Mr. Devine expressly told Ms. Cabral that he did not want her to tell management about his condition. (I:167-68; II:39). Based on these instructions, Ms. Cabral never told management that Mr. Devine was HIV positive. (I:168-69).

11. According to Mr. Devine, some time after this Sunday conversation, he gave Ms. Cabral a doctor's note indicating that it was safe for him to work at Stop & Shop, and Ms. Cabral crumpled up the note. (I:96-97; II:18-19, 45). The note from the doctor asked that Mr. Devine "be given every consideration" but did not specify any limitations from which Mr. Devine may have suffered, nor did it request any specific accommodation. (II:44-45). Ms. Cabral denies receiving the note. (I:96-97). In any event, Mr. Devine instructed Ms. Cabral not to convey his medical information to management, and she complied with that request.

12. Mr. Devine had trouble completing his work at the Bake Shop. Without being asked, Mr. Devine's co-workers helped him out. Specifically, but without limitation, Messrs. Bruno and Avila did some of Mr. Devine's pan-out duties during their day shifts as did the baker, Michelle Zainyeh ("Ms. Zainyeh"). (See I:99-101, 119, 121-25, 129-30, 174, 180; II:50-51). For the most part, they did this without notice to Ms. Cabral, just to help Mr. Devine. (I:119, 121, 123-25, 129-30, 180).

13. There is no evidence in the record from which the court can determine whether Mr. Devine's inability to complete the assigned tasks was due to his HIV status or for some other reason.

14. Beginning in September, Mr. Devine's co-workers became less and less available to help him out. Thus, on September 25, 2000, Mr. Avila transferred to another store. (II: 86-88; Ex. 11). Mr. Bruno also transferred to another store on October 29, 2000. (II:88; Ex. 12). Finally, Ms. Zainyeh left on a one-month medical leave beginning on October 9, 2000. (I:54-55).

15. Ms. Cabral filled in for Ms. Zainyeh as the baker, and was confronted with the problems caused by Mr. Devine's inability to complete his work. (I:100, 111-12). When Ms. Cabral arrived in the mornings, the pan-out was incomplete and the department was not clean. (I:112-13, 171-73). Ms. Cabral needed to do a lot of this work herself, thereby delaying her morning baking. (I:81, 100, 111-13, 118, 171-73). Eventually, Ms. Cabral needed to assign other employees to do the pan-out during the day, reducing the amount of work Mr. Devine had to do in the evening. (I:136, 145-46, 171-73). Nevertheless, on occasion, he was still unable to complete his work. (I:146).

16. Ms. Cabral asked Mr. Devine to inform the store manager, Mr. Slarve, or the perishable manager, Ms. Paris, of his condition. (I:95; II:20, 45). Mr. Devine refused, and insisted on keeping his HIV status confidential. He also asked Ms. Cabral not to disclose his illness nor his performance issues to management. (I:95, 149, 166-68; II:20, 22, 45-49, 68).

17. Ms. Cabral felt that she could not tell management about Mr. Devine's poor performance without being able to inform them of his medical condition. Without an explanation, management would simply assume that he was unable to do his job and terminate his employment. Ms. Cabral felt that she could not ask for more help for Mr. Devine unless she could explain his situation, since his job responsibilities were not onerous. (I:99, 102, 109-110, 113-14). She encouraged Mr. Devine to inform management of his medical condition and provide a doctor's note, but he refused. (I:98, 114-15, 143-44, 148, 167-69).

18. Neither Ms. Cabral nor Mr. Devine ever informed Stop & Shop management of Mr. Devine's medical condition. Nor did Mr. Devine ever request an accommodation. Rather, he apparently wanted Ms. Cabral to provide

-4-

    him with whatever help he needed to complete his job responsibilities without involving management. (I:175, 108, 168-69).

19. At some point, Ms. Paris learned of Mr. Devine's HIV status. She had no information or knowledge that it affected his job performance in any way, or his ability to finish his work. (I:68, 82-83).

20. On November 8, 2000, Ms. Paris learned that the pan-out had not been completed. She asked Mr. Devine about it, and he said that it had been done. Ms. Paris wrote up a counseling report for misinforming her that he had finished the pan-out. (I:69-73, 80-81, 92; Ex. 6).

21. On November 9, 2000, Mr. Slarve issued Mr. Devine a written counseling report for tardiness. Mr. Devine was late 18 out of 23 days over a four-week period. (I:20, 44-46; Ex.4).

22. On November 14, 2000, Ms. Paris wrote up a counseling report for Mr. Devine because he reported to work 45 minutes late without calling to say that he would be tardy. (I:83-84; Ex. 7).

23. Mr. Devine complained to his union in late November seeking to have Ms. Paris' reports removed from his file, and to receive four hours of pay as compensation for the disciplining. (I:85-86; II:59-61, 64). Mr. Devine and a union steward met with Mr. Slarve and Ms. Paris to discuss the situation. At the meeting, Mr. Devine attributed his repeated tardiness to his always coming to work from school; he did not raise any issue about his medical condition. (I:21; II:62). The union sided with Stop & Shop and Mr. Devine's record remained unaltered. (II:60).

24. Shortly thereafter, Mr. Devine told management that he was resigning to be a full-time student, and he gave two-weeks notice. (I:175-76; II:62). He left his employment with Stop & Shop on December 9, 2000, before the end of the two weeks. (I:50; Ex. 5).

25. Mr. Devine never requested an accommodation. He never informed management of his medical condition, or even that he had a medical condition which required some accommodation.

26. Though Stop & Shop management may have heard rumors about Mr. Devine's HIV status, management was never informed of this status

officially, nor was it given the opportunity to either understand the need for accommodation or provide any accommodation.

27. Stop & Shop made accommodations for other employees with health-related conditions while Mr. Devine was employed by Stop & Shop.

28. There is no evidence that Stop & Shop would not have accommodated Mr. Devine by altering his workload or schedule, if given appropriate medical information and if management had been requested to do so.

29. Mr. Devine never altered his instructions to Ms. Cabral that she refrain from informing management of his medical condition.

## II.  RULINGS OF LAW

1. The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

2. Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). See also Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).

3. To prevail on his claim of failure to provide a reasonable accommodation, Mr. Devine must establish that (1) he was disabled within the meaning of the ADA, (2) that he was able to perform the essential functions of his job with or without a reasonable accommodation, and (3) that Stop & Shop, despite knowing of his disability, did not reasonably accommodate it. Estades-Negroni v. The Assocs. Corp. of North America, 377 F.3d 58, 63 (1st Cir. 2004).

### HIV Status as a Disability

4. "The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." Wright v. CompUSA, Inc., 352 F.3d 472, 475-76 (1st Cir. 2003) (citing 42 U.S.C. § 12102(2)). "Merely having an impairment does

not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." Toyota Motor Mfg. Ky., Inc. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681, 690, 151 L. Ed. 2d 615 (2002) (citing 42 U.S.C. § 12102(2)(A) (1994 ed.)).

5. It is established that an HIV infection is a physical impairment under the ADA, and that it may substantially limit a major life activity, i.e., reproduction, at least of a woman. See Bragdon v. Abbott, 524 U.S. 624, 641-42, 118 S. Ct. 2196, 2207, 141 L. Ed. 2d 540 (1998).

6. The burden is on the plaintiff to prove a substantial limitation on a major life activity. Some courts have determined that having HIV "undeniably" and substantially impacts a major life activity and, therefore, no specific determination is necessary in any given case. See Hernandez v. Prudential Ins. Co. of Am., 977 F. Supp. 1160, 1163 (M.D. Fla. 1997), and cases cited.

7. Other courts have found that the ADA requires an individualized determination "of whether a plaintiff's asymptomatic HIV substantially limits one or more of his major life activities." See Hernandez v. Prudential Ins. Co. of Am., 977 F. Supp. 1160, 1163 (M.D. Fla. 1997), and cases cited. Thus, some courts have held that claims of a substantial limitation based on HIV status fail without evidence that HIV substantially limits a man's ability to reproduce, see Cruz Carrillo v. AMR Eagle, Inc., 148 F. Supp. 2d 142, 145 (D.P.R. 2001), or absent evidence that the claimant intended to have children. See Blanks v. Sw. Bell Comm. Inc., 310 F.3d 398, 401 (5th Cir. 2002).

8. In the instant case, Mr. Devine did not submit any evidence relating to the issue of whether his HIV status limited the major life activity of reproduction.

9. "If an individual is not substantially limited with respect to any other major life activity, the Court may consider whether the individual is substantially limited in the major life activity of working. To be substantially limited in the major life activity of working, one must be 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' 29 C.F.R. § 1630.2(j)(3). While an individual need not be completely unable to work, one is not substantially limited in working if he or she is unable to perform a single job or a narrow range of

jobs." Blanks v. Sw. Bell Comm. Inc., 310 F.3d 398, 401 (5th Cir. 2002) (internal citation omitted).

10. In the instant case, Mr. Devine did not submit any evidence to the effect that his ability to work was significantly restricted. At most, the evidence shows that, on some occasions, Mr. Devine was unable to complete the tasks assigned to him. However, he could, and did, continue to work.

### Notice of Disability and Request for Accommodation

11. "An employer violates the ADA if it 'knows of a disability yet fails to make reasonable accommodations.'" Estades-Negroni v. The Assocs. Corp. of N. Am., 377 F.3d 58, 63 (1st Cir. 2004) (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999)).

12. "Ordinarily, the employer's duty to accommodate is triggered by a request from the employee. That is because an employee's disability and concomitant need for accommodation are often not known to the employer. Thus, the plaintiff has the burden of showing that [he] sufficiently requested the accommodation in question." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (internal citations and quotations omitted).

13. "The employee's request must be sufficiently direct and specific, giving notice that [he] needs a special accommodation. At the least, the request must explain how the accommodation requested is linked to some disability. The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (internal citations and quotations omitted).

14. "Different rules may apply in situations where a disability prevents the employee from requesting an accommodation, or where the need for an accommodation is obvious." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 103, n.11 (1st Cir. 2007). In the instant case, however, Mr. Devine's medical condition did not prevent him from requesting an accommodation. See id. Nor is there any evidence that his HIV status, or the need for an accommodation due to a disability under the ADA, was so obvious that no discussion was needed.

15. "An employer need not provide accommodations where it does not know an employee has a disability." Estades-Negroni v. The Assocs. Corp. of N. Am., 377 F.3d 58, 64 (1st Cir. 2004) (citing Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)) (additional citations omitted).

### Constructive Discharge

16. "To make out a case for retaliation, 'a plaintiff must show that (i) [he] undertook protected conduct, (ii) [he] suffered an adverse employment action, and (iii) the two were causally linked." Feliciano-Hill v. Principi, 439 F.3d 18, 26 (1st Cir. 2006) (quoting Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005)).

17. "[T]o establish a constructive discharge, a plaintiff must show 'that [his] working conditions were so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign,' an objective standard that 'cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.'" Feliciano-Hill v. Principi, 439 F.3d 18, 27 (1st Cir. 2006) (quoting Marrero v. Gova of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)). See also Vieques Air Link, Inc. v. U. S. Dep't of Labor, 437 F.3d 102, 108 (1st Cir. 2006) (to establish a constructive discharge the employee must show that the working conditions "had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign.") (internal citation omitted).

### III.  CONCLUSIONS

1. This court will assume, without deciding, that Mr. Devine suffered from a disability which significantly impaired a major life activity as a result of having HIV.

2. Stop & Shop management was not aware of Mr. Devine's medical condition other than through rumors. Mr. Devine did not give Stop & Shop management notice of his disability or his need for an accommodation.

3. Mr. Devine never requested an accommodation. In fact, even when he met with management and his union representative, Mr. Devine failed to disclose his medical condition or any need for an accommodation. Instead, he stated that he was late for work due to conflicts with his school schedule.

4.  Stop & Shop was not "put on notice of a 'sufficiently direct and specific' request for [the plaintiff's] desired accommodation." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 103 (1st Cir. 2007).

5.  Mr. Devine made a conscious decision not to disclose either his disability or his need for accommodation to Stop & Shop management.

6.  Under such circumstances, Stop & Shop was not obligated to fashion an accommodation for Mr. Devine, and thus did not violate the ADA.

7.  Mr. Devine was not constructively discharged. His working conditions were not altered. Nor were they so difficult or unpleasant that a reasonable person would have felt compelled to resign.

8.  Judgment shall be entered in favor of the DEFENDANT.

    / s / Judith Gail Dein  
Judith Gail Dein  
United States Magistrate Judge